Filed 10/21/20  P. v. Clark CA2/3
Opinion following transfer from Supreme Court

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>MARKESE DEWON CLARK,<br><br>    Defendant and Appellant. | B279396<br><br>(Los Angeles County<br>Super. Ct. No. MA058334) |
| In re<br><br>    MARKESE DEWON<br>    CLARK<br><br>        on Habeas Corpus. | B291549<br><br>(Los Angeles County<br>Super. Ct. No. MA058334) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Frank M. Tavelman, Judge.  Affirmed.

ORIGINAL PROCEEDINGS; petition for writ of habeas corpus, Frank M. Tavelman, Judge.  Petition denied.

James Koester, under appointment by the Court of Appeal, for Defendant, Appellant and Petitioner.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Steven D. Matthews, Ryan M. Smith and John Yang, Deputy Attorneys General, for Plaintiff and Respondent.

───────────────

Two-year-old King J.[1] died from blunt force head trauma inflicted while in Markese Devon Clark's (Clark) care. At his trial, Clark contended that King, unbeknownst to Clark, had a prior, unrelated head injury that left his head susceptible to reinjury. Thus, even a minor event, such as playfully tossing King in the air or administering what Clark calls "old school" punishment of hitting the baby on his head, could have caused King's death. Based on that theory, Clark contended on appeal that the trial court should have instructed the jury on assault with force likely to produce great bodily injury as a lesser included offense to assault on a child causing homicide, on which the jury was instructed and of which Clark was found guilty.

In our original opinion filed in 2019, we rejected that contention because there was insufficient evidence to instruct the jury on the lesser included offense. We also rejected Clark's remaining contentions concerning, for example, *Sanchez*[2] error, and denied his related petition for writ of habeas corpus. Accordingly, we affirmed the judgment.

───────────────

[1] To avoid confusion, we identify individuals who share the same surname by their first names. No disrespect is intended.

[2] *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*).

2

Clark petitioned for review. The California Supreme Court granted review and transferred the matter with directions to vacate our decision and to reconsider the cause in light of *People v. Perez* (2020) 9 Cal.5th 1. *Perez* at page four held that the failure to object to case-specific hearsay pre-*Sanchez* did not forfeit the issue on appeal. Because our original opinion did not find that the *Sanchez* issue was forfeited, *Perez* does not affect that opinion. Accordingly, on reconsideration, we affirm our original decision in its entirety.

## BACKGROUND

I.  King

Ericka and Donald had three children, two daughters and King. In the summer of 2012, the girls were eight years old (Joy) and five years old. King, who was born on December 29, 2010, was almost two years old. With respect to King, Ericka had a normal pregnancy and delivery, and his checkups, the last of which was in July 2012, were normal.

However, in July 2012, King fell down 15 or 16 concrete or tiled stairs, resulting in a bump to his head, although he did not lose consciousness. Emergency room doctors examined and released him that same day. Although Ericka remembered the one fall, Joy remembered King falling down stairs a second time, which also prompted a trip to the emergency room. Ericka, however, said that while King got other bumps on his forehead from falling or running into something, this all happened before July 2012.

Around August 2012, Ericka and Donald separated. Soon thereafter, in September 2012, Ericka resumed a relationship with Clark, whom she had dated in the past. Clark and his two children—three and one-year old girls—moved into a two-

3

bedroom apartment in Long Beach with Ericka and her three children.  Ericka worked as a personal banker for Wells Fargo, while Clark cared for the children and worked on his music at home.

Caring for five children at times frustrated and overwhelmed Clark.  Once, a neighbor heard King "crying, crying, crying," and Clark yelling, " 'Sit the fuck down.  Shut the fuck up.' "  The neighbor heard Joy say she knew how to quiet King.  Another time, the neighbor saw Clark come outside to "pull himself together."  When the neighbor told him the kids were crying, he went back inside.

As to discipline, Ericka and Clark agreed he would not spank Ericka's children to avoid problems with Donald.  Ericka never saw Clark hit her children, and he never told her he had done so.  Even so, Clark complained that Ericka and Donald babied King, who Clark called a "crybaby."  When King cried, Clark would tell him to "man up."  Clark fantasized that he and Ericka would have a son who Clark would teach to be "tough" and to "really be a boy."  Clark's notion of how to really be a boy included telling King not to play with "girl stuff," like his sister's toys.

King thus never warmed to Clark.  And, after Donald left, King lost his "spunk" and was sad.  Ericka attributed this to King missing his father, to whom he was close, and she considered taking King to a psychologist.

In mid-October 2012, Ericka and Clark moved to a four-bedroom house in Lancaster, where Ericka continued to work for Wells Fargo and Clark continued to stay at home caring for the children, although King's sisters were in school during the day.

4

II.     The events leading to King's death

On Christmas Eve 2012, the family celebrated, King perhaps too much, for he ate a lot of sweets. The next day, he threw up and was weak, although he didn't have a fever. Over the next few days, he seemed better, although he was mopey and not himself. On the day of his second birthday, December 29, he uncharacteristically ate his cake slowly and moved slowly. Concerned, Ericka considered taking him to the doctor.

On January 2, 2013, Ericka worked all day, and Clark did not say anything was wrong with King. When Ericka got home that night at 8:45 p.m., King was already asleep. Thinking it was too early for King to go to bed, Ericka woke him. When she put him down, he wasn't able to hold his balance. Although King ate slowly, at "not his normal pace," he otherwise seemed fine.

The next morning, January 3, 2013, Ericka went to work. The children remained at home with Clark. At 11:00 a.m., Clark called Ericka and said that King had fallen and was being rushed to the hospital. When a responding paramedic arrived, King was not breathing, and his heart was not beating. King was also "extremely cold" and damp. The paramedics took King to Antelope Valley Hospital, but he was later transported to Kaiser. Doctors drilled burr holes into his head to drain fluid that had accumulated on his brain. When King's neurologic function didn't improve, he was removed from life support on January 17. Two days later, he died.

At the time of his death, King weighed 25 pounds and was 39 inches tall.

III.    Joy's testimony

Soon after King died, eight-year-old Joy gave a recorded statement on January 21, 2013 about what happened to her baby brother. She said that Clark had been throwing King "in the air and pulling him down and they fell back, and then he picked him up and went to go put him in the shower." "[H]e put him down," "[h]e fall back, and he was crying, he just fell back, fell out." A few minutes later, Clark said King hit his head in the bathtub. When Clark later said King fell down the stairs, Joy tried to say that didn't happen, but Clark shushed her. Joy also reported that Clark would "pop[ ]" King on the behind and send King upstairs when he got mad at King. Also, Clark "makes King hit his head." Clark would take King into a bedroom and Joy could hear "head bumps" every time Clark "whoop[ed]" King, who cried.

At trial, Joy, who was now 11 years old, testified she never saw Clark spank King, but Clark did "pop him in the head sometimes. He popped him in the behind and his head." On the day King went to the hospital, Clark was playing with the kids in the carpeted living room. When Clark threw King into the air, King vomited onto Clark's shirt. Clark took King upstairs to bathe him. Clark came back downstairs, crying and saying, " 'King's not breathing.' "

IV.    Medical testimony

Two experts testified for the prosecution: Dr. Jason Tovar and Dr. Carol Berkowitz.

A.    *Dr. Tovar*

Deputy Medical Examiner Jason Tovar autopsied King. He also reviewed King's medical records, the coroner's investigator

6

report, a post autopsy ophthalmologist report, and a post autopsy neuropathology report.

Dr. Tovar's internal examination of King's head revealed contusions on the scalp's undersurface in the frontal regions toward the forehead and across the top of the head and hemorrhage on the back of the head on the bone. More specifically, King had hemorrhages in the subcutaneous, subgaleal, and subdural regions of his brain. The subcutaneous hemorrhage was diffuse (spread out) and located to the left side of his head just above the ear and into the back, indicating unnatural trauma. King also had diffuse subgaleal hemorrhage to the back of his head, on the left side of his scalp over a fairly large area. Because the subgaleal region is below the skin and subcutaneous regions, hemorrhage to the subgaleal area suggested application of a "larger," "harder" or "significant" force. The presence of hemorrhaging to the back, top, and side of King's head indicated multiple applications of force. A hand striking the head or the head hitting a hard, flat surface could cause the subcutaneous and subgaleal hemorrhages.

In addition to the subcutaneous and subgaleal hemorrhages, King had a subdural hemorrhage on his right posterior parietal region. Disruption of the small veins running from the brain's surface to the central portion of the dura[3] caused the hemorrhage. Such disruption occurs "through force and acceleration, deceleration, or stretching or sheering effects." Acceleration and deceleration can cause bleeding into the retinas. Dr. Tovar therefore dissected King's eyes and sent them to an

---

[3] The dura is the layer of fibrous tissue on the inside of the skull.

ophthalmologist, who found retinal hemorrhages. Dr. Tovar also sent King's brain to a neuropathologist, who found no indication of "natural disease process." Dr. Tovar relied on these reports to form his opinion about cause of death.

In addition to the hemorrhages to King's head, he had an older (weeks or longer) hemorrhage and calcification to the mesentery, suggesting prior injuries to that area, "probably" from some form of blunt force trauma.

Notwithstanding his internal injuries, King had no external bruising. However, a child struck hard enough on the head to cause internal damage might not exhibit external signs of the injury.

Dr. Tovar could not ascribe the blunt force injuries to anything natural, and nothing else in the known circumstances "corroborate[d]" multiple injuries in different sites. However, shaking a baby so that the baby's head hits a flat surface like a bathtub could cause the hemorrhaging, including the retinal hemorrhaging King suffered. Striking a baby with an open hand could also cause those injuries. But falling back onto a carpeted surface could not cause them. Dr. Tovar therefore determined that nonaccidental blunt head trauma caused King's death and that the mode of death was homicide.

On cross-examination, Dr. Tovar agreed that veins on the brain that had once bled and then healed could "[p]otentially" be more susceptible to reinjury, depending on "when we are talking about, what time interval, and the amount of the injury." Bleeding veins on the brain could cause sudden severe headache, seizures, nausea or vomiting, and loss of coordination and balance. Tossing a child into the air a couple of times and then putting him on carpeted floor onto which the child falls back and

hits it head would not be enough force to cause the veins to bleed. But falling down stairs could cause that type of injury. If a child fell down stairs, causing the veins on his brain to bleed, that location could be more susceptible to reinjury.[4] And, if five months later "I give this kid a little pop on his head, even though it's not with tremendous force and even though it doesn't even leave bruising on the outside," it might be enough to cause that vein to start bleeding again.

However, a microscopic review of King's dura showed no prior injury. None of the hemorrhages could have resulted from an injury occurring five months before January 3, 2013—that is, the fall down the stairs. Also, there was no evidence of any prior injury that could have caused or contributed to the subdural hemorrhage.

B.     *Dr. Berkowitz*

Dr. Carol Berkowitz is board-certified in pediatric emergency medicine and in child abuse pediatrics. She reviewed King's medical records from Antelope Valley and Kaiser hospitals, paramedic reports, his well-child visits, and the ophthalmology report.

King's condition when paramedics arrived—fixed and dilated pupils, lack of a pulse, and cold to the touch—suggested that "this event had gone on for a bit of time." His low rectal temperature, which was taken at Antelope Valley, also suggested that King's inability to maintain body temperature had been

---

[4] The doctor had only become aware of King's prior falls and emergency room visit after he'd formed his opinion about cause of death. Dr. Tovar did not have King's medical history prior to January 3, 2013.

ongoing for a while.  Although a CT scan of King's head taken when he was admitted showed no abnormalities such as subdural bleeding, that could be because his heart had stopped circulating blood to the site of the bleed.  Thus, when doctors were able to get King's heart beating, another CT scan showed the hemorrhages.

Also, when King was admitted, he had petechiae—tiny hemorrhages present in the back of the eye.  Later, an ophthalmologist examined King and confirmed he had multiple retinal hemorrhages in all four eye quadrants, indicating a shaking or an acceleration and deceleration.  Shaken baby syndrome occurs when the brain is subjected to "whiplash, like acceleration, deceleration," and it "swooshes back and forth within the skull."  Veins separate from the dura and they bleed, causing edema or an inability to regulate breathing.  Retinal hemorrhages are also associated with shaken baby syndrome.

In Dr. Berkowitz's opinion, King suffered nonaccidental head trauma occurring around the time he became symptomatic, meaning when he stopped breathing and his heart stopped beating.  The catastrophic event that caused King to stop breathing could not have occurred several days before January 3, 2013, because the CT scan at Antelope Valley where King was first admitted would have shown the presence of blood.  She agreed with Dr. Tovar that hitting a child does not necessarily leave external bruising or swelling.

On cross-examination, Dr. Berkowitz admitted she had only recently learned of King's earlier fall down stairs.  However, it was her understanding that the emergency department did not order imaging studies, which indicated there was no evidence of intracranial injury.  If King had such an injury, he would not

10

have been in such great health until the time of the event on January 3, 2013.

Still, Dr. Berkowitz generally agreed that if a child hit his head causing veins to bleed, that area would be susceptible to nonfatal "rebleeding." But, if King had such rebleeding, then a CT scan five months after the event would not have been normal and instead would have shown hygroma, which is the fluid that persists after a prior bleed. King had no hygroma. Stated otherwise, if King had a bleeding caused by his fall down stairs and if some minor trauma occurred five months later on January 3, 2013 that caused a rebleed, then he would not have had a normal CT scan on January 3. Thus, King's fall down stairs did not affect her opinion that King suffered nonaccidental head trauma on or about January 3.

V.     Clark's statement to the police and trial testimony

Clark gave a recorded statement to Detective Scott Mitchell on January 3, 2013, after King had been taken to the hospital. Clark denied hitting or shaking King that day; all he did was pick up King and toss him in the air. But, he had, prior to January 3, "smacked" King across the back of his head with an open hand. Clark estimated he had hit King "ballpark" 15 times, "max" 20 times. On a one to 10 scale, with 10 being the hardest he could hit, he hit King at a seven. Once or "a few times" Clark "got a little bit" "too much" and "exceeded [his] . . . power" and hit King at a nine or 10. Still, Clark never knocked King out; King would just fall to the ground and cry. Around the holidays, Clark did not hit King, who was under the weather, so he got a "pass."[5]

_____

[5] Clark's statements on this point were a bit vague, because he later indicated he might have hit King after Christmas.

11

Clark had "no doubt" he caused King's injuries. Clark knew "it was a head injury because I know he hit his head a couple times."

Clark testified at trial and continued to deny hitting or shaking King on January 3, 2013. He also tried to minimize his prior statements to Detective Mitchell, saying they were inaccurate, prompted by fear and the hope that if he just said "something" he could get back to his kids faster. Thus, he denied spanking or, as he called it, "pop[ping]," King on the head while they lived in Long Beach. However, Clark, who weighed 245 pounds in contrast to King's 25 pounds, admitted he did hit King on the head with an open hand when they moved to Lancaster. This happened not "very often," "like eight times." When he did hit King, "it wasn't at a seven or eight or nine. It was not every single time at that force." Even so, Clark admitted he did "sometimes" hit King at a seven and exceeded his power once. King would cry for a few minutes, but Clark never knocked King off balance and he never saw any resulting bruises or swelling. The last time he could recall hitting King was before Christmas.

On New Year's Eve, Clark found King on the floor, crying and grunting and seeming not to have control of his body. He told Ericka they should take King to the emergency room, but she didn't want to incur the cost of an ambulance. The next morning, January 1, King was much better.

Two days later, on January 3, 2013, Clark was playing with the kids in the living room. He tossed King into the air three times, catching him as he came down. The last time, King fell back when Clark put him down and landed straight on his back and on his head. Clark picked him up, and King threw up, dirtying himself and Clark's shirt. Clark took King to the bathroom, where he stripped him, put him into the tub, and

12

washed him with cold water. Clark did not see King hit his head in the tub. After washing King, Clark took him upstairs and dressed him. That was when Clark noticed King was unresponsive. He ran downstairs with King and called 911, telling the operator that King "had hit his head."

He did not know about King's prior fall down the stairs.

VI.    Trial and sentencing

An information charged Clark with assault on a child causing death, which is commonly known as child assault homicide[6] (Pen. Code, § 273ab, subd. (a); count 1)[7] and with murder (§ 187, subd. (a); count 2). A jury found Clark guilty of count 1 and found true a great bodily injury enhancement (§ 12022.7, subd. (d)). The jury found Clark not guilty of murder but guilty of the lesser offense of involuntary manslaughter (§ 192, subd. (b); count 2).

On October 21, 2016, the trial court sentenced Clark to 25 years to life on count 1. The trial court imposed but stayed a three-year sentence on count 2 and struck the enhancement.

## CONTENTIONS

Clark raises the following issues: (1) The trial court should have instructed the jury on assault with force likely to produce great bodily injury as a lesser included offense to count 1; (2) expert witness doctors relied on impermissible hearsay in violation of *Sanchez, supra,* 63 Cal.4th 665; (3) admitting Clark's statement to the detective violated *Miranda v. Arizona* (1966)

---

[6] *People v. Wyatt* (2012) 55 Cal.4th 694, 697, footnote 2 (*Wyatt II*).

[7] All further statutory references are to the Penal Code.

13

384 U.S. 436 (*Miranda*); (4) the trial court should have given a unanimity instruction; (5) prosecutorial misconduct; (6) cumulative error; and (7) ineffective assistance of trial counsel.

## DISCUSSION

I.    Failure to instruct on a lesser included offense

Clark's first contention is the trial court prejudicially erred by failing to instruct the jury on assault with force likely to produce great bodily injury as a lesser included offense to child assault homicide.[8]  We disagree.

A.    *The duty to instruct on lesser included offenses*

Even in the absence of a request, a trial court must instruct on the general principles of law, including lesser included offenses, relevant to the issues raised by the evidence.  (*People v. Smith* (2013) 57 Cal.4th 232, 239; *People v. Breverman* (1998) 19 Cal.4th 142, 154.)  Instruction on a lesser included offense is required when there is evidence the defendant is guilty of the lesser offense, but not the greater.  (*People v. Whalen* (2013) 56 Cal.4th 1, 68.)  Substantial evidence is evidence a reasonable jury could find persuasive.  (*People v. Williams* (2015) 61 Cal.4th 1244, 1263.)  The "testimony of a single witness, including . . .[the] defendant, may suffice."  (*Wyatt II*, *supra*, 55 Cal.4th at p. 698.)  In determining whether substantial

---

[8] The trial court reasoned that the "facts really don't support that, and, in fact, if [Clark] had been convicted of 875 [assault with force likely to produce great bodily injury] because the individual didn't die in this case, I think it would lead to a conviction in the greater."

evidence existed, we do not evaluate the credibility of the witnesses, a task for the jury. (*Ibid.*) However, the existence of *any* evidence, no matter how weak, will not justify an instruction. (*Whalen*, at p. 68.) Thus, the "obligation to instruct on a lesser included offense does not arise when there is no evidence that the offense was less than that charged." (*Wyatt II*, at p. 702.)

A "primary reason for requiring instructions on lesser included offenses is ' "to eliminate the distortion of the factfinding process that is created when the jury is forced into an all-or-nothing choice between [guilt] and innocence" '—that is, to eliminate ' "the risk that the jury will convict . . . simply to avoid setting the defendant free." ' " (*People v. Majors* (1998) 18 Cal.4th 385, 410.)

We independently review whether the trial court erred by failing to instruct on a lesser included offense. (*People v. Nelson* (2016) 1 Cal.5th 513, 538; *People v. Trujeque* (2015) 61 Cal.4th 227, 271.) Reversal is not warranted unless it appears " 'reasonably probable' the defendant would have achieved a more favorable result had the error not occurred." (*People v. Breverman*, *supra*, 19 Cal.4th at p. 149.)

B.    *Assault*

As a general matter, assault crimes are ones of general intent that do not require a specific intent to cause injury. (*People v. Williams* (2001) 26 Cal.4th 779, 782, 788; see *People v. Albritton* (1998) 67 Cal.App.4th 647, 658 [child assault homicide is a general intent crime].) To be guilty of assault, a defendant must be aware of facts that would lead a reasonable person to realize that a certain consequence would directly, naturally and probably result from his or her actions. (*Williams*, at p. 788.)

15

However, a defendant may not be convicted based on facts he did not know but should have known. (*Ibid*.)

As to child assault homicide specifically, its elements are: "(1) a person, having the care or custody of a child under the age of eight; (2) assaults the child; (3) by means of force that to a reasonable person would be likely to produce great bodily injury; (4) resulting in the child's death."[9] (*People v. Wyatt* (2010) 48 Cal.4th 776, 780–781; *Wyatt II*, *supra*, 55 Cal.4th at p. 702.) The jury here was accordingly instructed as to the third element regarding mens rea that the prosecution had to prove that when Clark "acted, he was aware of facts that would lead a reasonable person to realize that his act by its nature would directly and

---

[9] The trial court instructed the jury that child assault homicide required the prosecution to prove:

"1.  The defendant had care or custody of a child who was under the age of 8;

"2.  The defendant did an act that by its nature would directly and probably result in the application of force to the child;

"3.  The defendant did that act willfully;

"4.  The force used was likely to produce great bodily injury;

"5.  When the defendant acted, he was aware of facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in great bodily injury to the child;

"6.  When the defendant acted, he had the present ability to apply force likely to produce great bodily injury to the child;

"7.  The defendant's act caused the child's death.

[¶] . . . [¶]

"Great bodily injury means significant or substantial physical injury.  It is an injury that is greater than minor or moderate harm."  (Italics omitted.)

16

probably *result in great bodily injury* to" King.  (Italics added.)  In contrast to child assault homicide, assault with force likely to cause great bodily injury, with which the jury was *not* instructed, requires proof that when defendant acted "he was aware of facts that would lead a reasonable person to realize that his act by its nature would directly and probably *result in the application of force* to someone."[10]

The difference between the two crimes is thus one of three words about what defendant knew his act would directly and probably result in:  either "great bodily injury" (child assault homicide) or the "application of force" (assault with force likely to produce great bodily injury).  "Great bodily injury" is "significant or substantial physical injury.  It is an injury that is greater than

_____

[10] Assault with force likely to produce great bodily injury requires the People to prove:  (1) The defendant did an act that by its nature would directly and probably result in the application of force to a person; (2) The defendant did that act willfully; (3) The force used was likely to produce great bodily injury; (4) When the defendant acted, he was aware of facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in the application of force to someone; and (5) When the defendant acted, he had the present ability to apply force likely to produce great bodily injury to a person.  The terms application of force and apply force mean to touch in a harmful or offensive manner.  The slightest touching can be enough if it is done in a rude or angry way.  Making contact with another  person, including through his or her clothing is enough.  The touching does not have to cause pain or injury of any kind.  The touching can be done indirectly by causing an object to touch the person.  Great bodily injury means significant or substantial physical injury.  It is an injury that is greater than minor or moderate harm.  (See, e.g., CALCRIM No. 875.)

minor or moderate harm." (CALCRIM No. 820, italics omitted.) In contrast, the "terms application of force and apply force mean to touch in a harmful or offensive manner. The slightest touching can be enough if it is done in a rude or angry way. Making contact with another person, including through his or her clothing is enough. The touching does not have to cause pain or injury of any kind. [¶] The touching can be done indirectly by causing an object . . . to touch the other person." (CALCRIM No. 875, brackets omitted.) Thus, arguably the difference between child assault homicide and assault with force likely to produce great bodily injury is one between "great bodily injury" and battery.

Clark thus argues that given the "ambiguous and contradictory evidence regarding multiple assaultive acts that could have caused the fatal injury and the quantum of force related to those assaultive acts" and King's prior falls down stairs "that made him more susceptible to a traumatic brain injury, there could be a reasonable doubt that [Clark] would objectively appreciate that his 'old school' popping the back of King's head . . . or his tossing King up into the air and catching him would likely result in" great bodily injury. As we therefore understand the argument, because Clark did not know of King's prior falls down stairs, Clark did not realize that hitting King on the back of the head or tossing him into the air could result in great bodily injury. Hence, the trial court should have instructed the jury on the lesser included offense of assault with force likely to produce great bodily injury.

This argument rests on the notion that a fall or falls down stairs left King's brain so susceptible to reinjury that a minor event, such as being playfully tossed into the air or falling back

18

onto carpet, caused multiple, diffuse hemorrhages to the subcutaneous, subgaleal, and subdural regions of his head. However, what, specifically, was the evidence that King suffered a subdural bleed in or about July 2012? The evidence relevant to this notion was limited to the following. In July 2012, King fell down 15 or 16 concrete or tiled stairs, resulting in a bump to his head. Emergency room doctors examined and released him without ordering a CT scan. Eight-year-old Joy recalled a second fall down stairs and trip to the emergency room. Five months later, around Christmas, King was ill and not himself. The prosecution's experts agreed with the general ideas that a fall down stairs could cause veins on a child's brain to bleed, and veins, having once bled and healed, could "potentially" be more susceptible to reinjury. And, according to Dr. Tovar, if months later someone gives the child a "little pop" on the head, that might be enough to cause the veins to bleed again or, as Dr. Berkowitz said, a nonfatal rebleed.

To be sure, this was substantial evidence King fell down stairs and had a bump to the head. It is not substantial evidence that King's fall down stairs *resulted* in bleeding in the veins on his brain.[11] Rather, substantial evidence requires *evidence* and not mere speculation. In any given case, one could "*speculate* about any number of scenarios that may have occurred," but a reasonable inference " 'may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or

---

[11] This point leads to the writ, which faults Clark's trial counsel for failing to call a defense expert witness to testify that the earlier fall could have caused King's veins to bleed and rendered his brain susceptible to reinjury. We discuss that issue *post*.

guess work. . . . A finding of fact must be an inference drawn from evidence rather than . . . a mere speculation as to probabilities without evidence.' " (*People v. Morris* (1988) 46 Cal.3d 1, 21; see *People v. Crew* (2003) 31 Cal.4th 822, 835 [speculation is not substantial evidence].) It is speculative to draw a line from King's fall down stairs to a subdural injury so extensive that a minor event such as tossing King in the air or hitting his head on carpet could cause his death.

And, to the extent Clark argues that his "pops" to King's head were mere "applications of force" amounting only to a battery, we disagree. King was only about 19 months old when Clark began caring for him and two years old when he died. Notwithstanding the fragility of such a young child's head, Clark admitted he hit King on the back of his head at least eight times. Although Clark contends there was ambiguity about the level of force he used, citing, for example, that he left no external marks on the child, he unambiguously said in his interview with Detective Mitchell *and* at trial that he sometimes hit King at a "seven" on a scale of one to 10, with a 10 being the hardest he could hit. At trial, he admitted he exceeded his power, albeit just "once." A reasonable person would have appreciated that hitting a baby on the back of the head would result in great bodily injury. Stated otherwise, to the extent Clark's argument the trial court should have instructed the jury on the lesser is based on his "old school" style of "discipline" which included "sometimes" hitting a baby on the head at a power level of seven, Clark, if guilty at all, was guilty of the greater offense. (See *Wyatt II, supra*, 55 Cal.4th at pp. 702–704 [forceful play-wrestling with 14 month old not simple assault].)

20

II.    *Sanchez* error

Clark next contends that Drs. Tovar and Berkowitz's reliance on the ophthalmologist and neuropathologist reports violated *Sanchez*, *supra*, 63 Cal.4th 665.[12]  As we now explain, we reject his contention that any prejudicial error occurred.

*Sanchez*, *supra*, 63 Cal.4th 665 addressed the manner in which expert witnesses—specifically in that case a gang expert— may refer to hearsay they relied on to support their opinion.  The court thus considered the extent to which the confrontation clause and our state hearsay rules preclude expert witnesses from relating "case-specific" hearsay in explaining the basis for an opinion.  Case-specific facts are those relating to the particular events and participants in the case being tried.  (*Id.* at p. 676.)  "Generally, parties try to establish the facts on which their theory of the case depends by calling witnesses with personal knowledge of those case-specific facts.  An expert may then testify about more generalized information to help jurors understand the significance of those case-specific facts.  An expert is . . . allowed to give an opinion about what those facts may mean." (*Ibid.*)  When an expert relates case-specific facts and treats the content of those statements as true and accurate to support the expert's opinion, the statements are hearsay.  And, if the "prosecution expert seeks to relate testimonial hearsay,[13]

_____

[12] Clark cursorily argues that the experts' reliance on police reports and King's well-child visits was also *Sanchez* error, but the thrust of his argument concerns the ophthalmologist and neuropathologist's reports.

[13] Testimonial statements are ones made with some degree of formality or solemnity and having the primary purpose of

21

there is a confrontation clause violation unless (1) there is a showing of unavailability and (2) the defendant had a prior opportunity for cross-examination, or forfeited that right by wrongdoing." (*Id.* at p. 686.)

We have no occasion here to consider whether the expert doctor witnesses violated *Sanchez* by relying on inadmissible hearsay, namely, the ophthalmologist and neuropathologist reports. Even if the information in those reports—that King had retinal hemorrhages and that he did not die of natural causes— were case-specific facts requiring the ophthalmologist and neuropathologist to testify as them, no prejudice accrued to Clark.

First, King's medical records otherwise established he had retinal hemorrhaging.[14] Dr. Tovar referred to "reports of retinal hemorrhages from the documentation," which prompted him to send King's eyes to an external consultant. Dr. Tovar then referred to a "report of retinal hemorrhages in the hospital setting." Dr. Berkowitz similarly reviewed King's medical records. Those records, and in particular the ones from Antelope Valley Hospital, showed "evidence of bleeding within the back of the eye . . . . I think the comment was that they were petechiae

---

establishing or proving past events relevant in a later criminal prosecution. (*People v. Edwards* (2013) 57 Cal.4th 658, 705.)

[14] Dr. Tovar testified that an individual's medical records reflecting treatment before death factored into his ultimate determination of cause of death: "If an individual is in the hospital for an extended amount of time, such as this case here, we would use some of that medical information to go back to identify what was happening immediately at the time of presentation to assess those findings, because some of the findings may be altered or different at the time of autopsy."

22

eye, little tiny hemorrhages that were present in the back of the eye" when King was at the hospital. By this, it is reasonably clear that the medical records were made by, for example, King's treating physicians. Therefore, to the extent the experts' conclusions that King was violently shaken or suffered blunt force head trauma relied on the presence of retinal hemorrhaging, the medical records established that fact.

However, the admissibility of those medical records is not before us. Clark concedes, properly, they are not testimonial and their admission did not violate his confrontation rights. Therefore, if the medical records are hearsay, they are *nontestimonial* hearsay. Experts "may . . . rely on nontestimonial hearsay properly admitted under a statutory hearsay exception." (*Sanchez*, *supra*, 63 Cal.4th at p. 685.) Clark did not object to King's medical records. And he does not argue on appeal that they were inadmissible under state evidentiary rules. Any issue as to admissibility under state law is therefore forfeited.

As to the neuropathologist's report, Dr. Tovar's reliance on it was harmless beyond a reasonable doubt. (See generally *Sanchez*, *supra*, 63 Cal.4th at p. 698.) The report merely confirmed Dr. Tovar's personal observation King did not die of natural causes. That is, Dr. Tovar's external and internal examinations of King's body revealed no congenital, cardiovascular or respiratory abnormalities. King's major organs similarly showed no abnormalities. The case-specific fact that King had no disease or natural condition that could explain his

death was therefore based on Dr. Tovar's personal observations.[15] The neuropathologist similarly ruled out, at a gross and microscopic level, any natural process that might have caused hemorrhages. Thus, the neuropathologist's report merely confirmed and buttressed Dr. Tovar's finding. Moreover, that finding—that a two-year-old child did not die from natural causes—was hardly a controversial one. The defense did not contend King died of natural causes. Rather, the defense theory was King died because some minor event on January 3, 2013 exacerbated a prior head injury.

III.    *Miranda*

Before trial, Clark moved, under *Miranda* to exclude his statements to Detective Mitchell. After setting forth additional facts regarding those statements, we conclude Clark was not in custody and therefore *Miranda* warnings were not required.

A.      *Additional facts*

To determine the admissibility of Clark's statements, the trial court held a hearing at which four law enforcement officers and Clark testified. The officers' testimony established that when deputies arrived at Clark's home, he was getting ready to leave for the hospital. A deputy put him in the back of a patrol car and another deputy stood watch nearby. When Detective Laura Bruner arrived, she asked Clark if he was willing to take a polygraph test. Clark said he would, so the officers moved Clark from the patrol car to an unmarked vehicle which had no internal

---

[15] Dr. Berkowitz similarly could think of no natural event in a healthy two year old that could account for the hemorrhaging in the brain, the retinal hemorrhaging, and the cardiac arrest.

24

cage.  A deputy sat next to Clark in the backseat en route to the station.  At the station, Clark was taken to an interview room where he signed a consent to take a  polygraph.  Detective Mitchell told Clark that he was not in custody, "nobody's put handcuffs on you, nobody's detained you, nobody's held you against your will.  I'm not going to make you stay or force you to stay or trick you to stay or anything like that.  That's not how we do it, okay?  We keep it on a very professional level, very low key."  Although Clark and the detective talked, Clark was never given a polygraph test.

Three of the officers testified that Clark was not handcuffed, and the fourth could not remember.  All officers said that Clark did not ask for an attorney.  None of the officers gave Clark his *Miranda* rights.

Clark, however, said he was handcuffed on the way to the patrol car, although he sat without handcuffs in the car, and he immediately asked for an attorney.  Although he was told he was not under arrest, he never felt free to leave.  He sat in the patrol car for about an hour before being moved to the unmarked vehicle.

In issuing its ruling, the trial court expressly resolved discrepancies between the officers' and Clark's testimony in the officers' favor, particularly whether Clark was handcuffed.  The trial court found that if Clark was in custody when he was put in the back of the patrol car for an hour, that custody or detention was "lifted" when he was taken out of the car.  Also, if Clark was in custody, "that was more than cured by" the detective's statement at the interview that Clark was free to leave.  Based on the totality of the circumstances, the trial court found that

Clark was not in custody, and therefore his statements were admissible.

   B.   *Clark was not in custody*

*Miranda, supra*, 384 U.S. 436 requires a suspect to a *custodial* interrogation to be advised of certain rights. (*People v. Mickey* (1991) 54 Cal.3d 612, 648.)  The test for whether a suspect is in custody is objective; the question is whether there was a formal arrest or a restraint on the freedom of the suspect's movement to the degree associated with a formal arrest. (*People v. Leonard* (2007) 40 Cal.4th 1370, 1400; *People v. Kopatz* (2015) 61 Cal.4th 62, 80 (*Kopatz*).)  Stated otherwise, would a reasonable person have felt at liberty to end the interrogation and to leave? (*People v. Ochoa* (1998) 19 Cal.4th 353, 401–402.)

   Whether a suspect is in custody depends on the totality of the circumstances. (*People v. Pilster* (2006) 138 Cal.App.4th 1395, 1403.)  Although no single factor is controlling, we consider " '(1) [W]hether the suspect has been formally arrested; (2) absent formal arrest, the length of the detention; (3) the location; (4) the ratio of officers to suspects; and (5) the demeanor of the officer, including the nature of the questioning.' [Citation.]  Additional factors are whether the suspect agreed to the interview and was informed he or she could terminate the questioning, whether police informed the person he or she was considered a witness or suspect, whether there were restrictions on the suspect's freedom of movement during the interview, and whether police officers dominated and controlled the interrogation or were 'aggressive, confrontational, and/or accusatory,' whether they pressured the suspect, and whether the suspect was arrested at the conclusion of the interview." (*Id.* at pp. 1403–1404.)

"Whether a [suspect] was in custody for *Miranda* purposes is a mixed question of law and fact." (*Kopatz, supra*, 61 Cal.4th at p. 80.) We apply a substantial evidence standard to the trial court's factual findings regarding the circumstances surrounding the interrogation, but we independently decide whether, given those circumstances, a reasonable person in the defendant's position would have felt free to end the questioning and to leave. (*Ibid.*)

Here, Clark argues he was in custody beginning when officers put him in the patrol car, where he sat for about an hour. Other than that, there is no indicia of custody. Clark was not searched, handcuffed or arrested. Notwithstanding that he sat in a patrol car for about an hour or more, there is no evidence he could not have left the car had he asked. (See *People v. Moore* (2011) 51 Cal.4th 386, 395–396 [defendant who agreed to talk to deputy in patrol car was not in custody].) Moreover, once Detective Bruner arrived, she *asked* Clark whether he would be willing to take a polygraph test. Clark confirmed that the detective "*asked* [him] would [he] take a polygraph test, and the first thing [he] asked, [he would] like to speak to an attorney. [Detective Bruner] told [him] [he was] not under arrest, . . . [w]e just want to talk to you, to take the poly to clear your name, and we will get you back to your kids. And [he] said, okay, because [he] wanted to get back to [his] kids." (Italics added.)

Then, at the station, Detective Mitchell told Clark "you are not in custody, nobody's put handcuffs on you, nobody's detained you, nobody's held you against your will. I'm not going to make you stay or force you to stay or trick you to stay or anything like that." Further, Clark signed a consent-waiver for polygraph examination form stating that he "*voluntarily*" agreed to submit

27

to the examination and understood he was free to terminate it any time.  Signing such a form strongly supports the voluntariness of an interview.  (*People v. Ochoa*, *supra*, 19 Cal.4th at p. 402.)  Under such a circumstance, a reasonable individual would know "that he or she can end a voluntary association with other individuals at will.  This is so despite the location of defendant's questioning:  the fact that he was questioned in the police station's polygraph examination room does not necessarily require a finding of custody, even if the room was in a secure area."  (*Id.* at p. 403.)

Nothing in the other circumstances surrounding Clark's interview shows that he was in custody.  He waited in the patrol car for only about an hour before Detective Bruner asked if would take a polygraph test.  The record also suggests that law enforcement officers drove Clark to the station as a matter of convenience, because he did not have car.  (See *Kopatz*, *supra*, 61 Cal.4th at p. 81 [inference was defendant needed a ride to station].)  There is no evidence that Detective Mitchell or any other law enforcement officer behaved aggressively toward Clark.  To the contrary, the transcript of Clark's interview indicates that Detective Mitchell behaved in a congenial, nonaggressive, and respectful manner.  The totality of the circumstances thus show that Clark was not in custody.

IV.    Unanimity instruction

Clark argues that the trial court should have given a unanimity instruction because the prosecution presented the following three discrete factual theories regarding the assault causing Clark's death:  (1) Clark disciplined King by "popping" him on the head, (2) Clark somehow knocked King's head against the bathtub, and (3) Clark violently shook King.  As a

preliminary matter, the prosecution did *not* present three discrete factual theories causing Clark's death. Clark's history of hitting King—or, as appellant's counsel characterizes it, "old-school punishment"—was relevant to show that Clark, in keeping with his practice, hit King on January 3, 2013 as well.[16] But, it was *not* the prosecution's theory that those prior assaults killed King on January 3. Rather, the prosecution's theory was Clark did something—hit King on the head and/or shook him violently perhaps causing King to hit his head on the bathtub—on January 3 that caused King's death.[17]

This leads us to the next problem with Clark's argument that a unanimity instruction was required. Such an instruction is necessary if there is evidence more than one crime occurred, "each of which could provide the basis for conviction under a single count" (*People v. Grimes* (2016) 1 Cal.5th 698, 727), because the jury must agree on the same criminal act (*People v. Russo* (2001) 25 Cal.4th 1124, 1132). However, there are exceptions to this general rule. One is the continuous-course-of conduct exception, which applies " 'when the acts are so closely connected in time as to form part of one transaction.' " (*People v.*

---

[16] It also could have been relevant to rebut any argument that to the extent King's susceptibility to injury was due to some prior event—that event was not the fall down the stairs: it was Clark's practice of hitting King at a level of seven, and sometimes at a nine or 10.

[17] It also was *not* the prosecutor's theory that King hitting his head on the carpet caused the subdural hemorrhage.

*Jennings* (2010) 50 Cal.4th 616, 679.)[18]  This exception also applies " '[w]here . . . the evidence establishes a pattern of physical trauma inflicted [on] a child [over] a relatively short period of time [and] a single course of conduct is involved.' " (*People v. Napoles* (2002) 104 Cal.App.4th 108, 116, italics omitted.)  Where, for example, the cumulative result or effect of the conduct is great bodily injury, a unanimity instruction is not required.  (*Jennings*, at p. 680.)

The exception applies here.  The prosecution theory was something catastrophic happened to King on January 3, 2013 over a short period of time.  The prosecutor did not argue, nor was there evidence, that hitting King's head or shaking him were separate, discrete acts.  The prosecutor therefore repeatedly argued in closing that the "head trauma was inflicted on January 3, 2013"; "based on the medical science and the evidence, it's undisputed that all that trauma that baby King had to endure and die from, it all happened on January 3"; "[Clark] inflicted the head trauma on January 3, 2013"; and Clark took King to the bathroom and gave him a "couple blows to the head . . . [a]nd after he did the blows, he shook baby King and baby King's head hit the bathtub.  That's why there's the subgaleal hemorrhage, and the rotation, the acceleration, deceleration, and the blows to the head from the head going forward and back and hitting the tub, the retinal hemorrhaging."  However, even if the jury could have believed that Clark's months-long history of hitting King, culminating in the fatal event on January 3, 2013, caused King's

_____

[18] Another exception is when the defendant offers the same defense or defenses to the various acts constituting the charged crime.  (*People v. Jennings, supra*, 50 Cal.4th at p. 680.)

heart to stop beating, that abuse could only have happened over a brief period of time, given that Clark and Ericka began living together in September 2012 and King stopped breathing on January 3, 2013.[19] (See, e.g., *People v. Ewing* (1977) 72 Cal.App.3d 714, 717 [unanimity instruction not required where physical abuse occurred over period of time].) Thus, where, as here, the evidence is that trauma was inflicted on a child within a relatively short period of time, the continuous course of conduct exception applies. (*People v. Napoles*, *supra*, 104 Cal.App.4th at pp. 115–116.) No unanimity instruction was required.

V.    Prosecutorial misconduct

While conceding there "was no single instance of egregious misconduct," Clark argues there nonetheless was a "pattern of subtle instances of prosecutorial misconduct."[20]

"The applicable federal and state standards regarding prosecutorial misconduct are well established. ' "A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct 'so egregious that it infects the trial with such unfairness as to make the

_____

[19] Indeed, Clark said he didn't start hitting King until the family moved to Lancaster, in October 2012.

[20] The Attorney General fails to respond meaningfully to this issue. Instead, the respondent's brief appears to have been cut and pasted from another case. That is, the Attorney General argues the issue has been forfeited, but defense counsel did object to the instances of alleged misconduct. Also, the respondent's brief refers to firearms possession, but firearms possession is not at issue.

31

conviction a denial of due process.' " ' [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves ' " "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " ' [Citation.] . . . [Citation.] Additionally, when the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." (*People v. Samayoa* (1997) 15 Cal.4th 795, 841.)

Here, the prosecutor's alleged pattern of misconduct consisted of, first, objecting during defense counsel's cross-examination of Dr. Berkowitz on the ground counsel was "almost yelling" at the witness. The trial court overruled the objection and found that counsel was not yelling at the doctor but was instead "putting emphasis in his example and maybe some indignation" into the question. The trial court, however, cautioned the prosecutor: "[S]o while I don't think your objection is misplaced now, what I don't want to see is, for any strategic reasons—and I have no reason to believe you'd do this, but to be interrupting counsel's method of cross-examination absent it just being obviously berating the witness or being argumentative." The trial court found that the objection, while overruled, was not "misplaced" and then simply informed the prosecutor it did not want to see interruption of cross-examination purely for "strategic reasons," which the court acknowledged had not occurred. No misconduct occurred.

Second, Clark contends that the prosecutor impugned his trial counsel's integrity by asking about how Clark and his

32

counsel discussed that trial would be about emotion overriding the evidence, and his counsel was "brillian[t]" at that. Defense counsel objected, and the trial court warned the prosecutor he was "walking on very dangerous ground. I understand why you want some of it to come in, but what I cannot and will not allow is for this to be manipulated in some way impugning the integrity of the defense." The trial court's warning was fair, because it is misconduct for a prosecutor to impugn defense counsel's integrity or to suggest defense counsel fabricated a defense. (*People v. Cash* (2002) 28 Cal.4th 703, 732.) Even so, it was a warning. As the trial court acknowledged, the prosecutor had not yet crossed the line. No misconduct occurred.

Next, during his closing argument, the prosecutor returned to this theme and said defense counsel "is brilliant at getting the jury to forget about the evidence and just look at the emotion, feel sorry for him [Citation.] . . . [Citation.] . . . and find him not guilty." The trial court overruled the defense objection. Although, as we have said, a prosecutor may not cast aspersions on defense counsel (*People v Hill* (1998) 17 Cal.4th 800, 832), a prosecutor may vigorously attack the defense case and focus on deficiencies in counsel's tactics and factual account. (*People v. Redd* (2010) 48 Cal.4th 691, 735; see, e.g., *People v. Medina* (1995) 11 Cal.4th 694, 759.) This was nothing more than a vigorous comment on defense tactics.

Finally, the prosecutor analogized conscious disregard for life to driving under the influence, where "someone goes out, drinks, drives, and murders someone" even though the person did not "intend to murder someone that night." Defense counsel objected to the prosecutor's reference to a "*Watson* murder D.U.I.

33

situation."[21]  The trial court sustained an objection, finding that the prosecutor oversimplified the law and, in doing so, misstated it.  However, the trial court told the prosecutor that the analogy was relevant and, if he intended to continue with it, to state the full elements of malice.  The prosecutor took the court's advice, telling the jury that a *Watson* murder is "where a person is advised of the dangers of driving through the courts, through the D.M.V., or through the sheriff's department, goes out drinking, knows about that, but yet still exercises complete disregard and does what they do . . . .  So the implied malice is nothing that's foreign here."  Thus, even if the prosecutor's misstatement was misconduct, reversal is not warranted because the prosecutor corrected his misstatement of law.  That correction mitigated any prejudice.  (See, e.g., *People v. Redd*, *supra*, 48 Cal.4th at p. 752 [no prejudice when prosecutor corrects his misstatement of fact].)

VI.    Cumulative error

As " '[w]e have . . . found any assumed errors to be nonprejudicial[,] [w]e reach the same conclusion with respect to the cumulative effect of any [purported] errors.' "  (*People v. Cole* (2004) 33 Cal.4th 1158, 1235–1236; *People v. Butler* (2009) 46 Cal.4th 847, 885.)

VII.   Petition for writ of habeas corpus

In his writ petition, Clark contends his trial counsel provided ineffective assistance by failing to consult with and to present a medical expert to support the defense theory that a

---

[21] In short, a *Watson* murder is one based on implied malice.  (*People v. Watson* (1981) 30 Cal.3d 290.)

contributing cause of King's fatal injury was his "compromised brain structure" from the earlier fall down stairs.

A. *Additional background*

To support his writ petition, Clark submitted the declaration of Dr. Marvin Pietruszka, a forensic pathologist. Dr. Pietruszka had been retained in April 2013 to review King's medical records in connection with a dependency matter concerning Clark's children. In a letter to counsel in that matter, the doctor noted that, based on King's subdural hematoma, retinal hemorrhage, and that he was in full arrest but was resuscitated, "an argument can be made that throwing a child up in the air can cause retinal hemorrhages and that falling onto the head can cause subdural hematomas. The absence of a skull or cervical spine fracture suggests that there was no trauma with an object and that the fall could be accidental. However, other factors must be considered as well and these include the numerous times that the child's head was hit with the caretaker's hand."

Thereafter, Clark's appellate counsel asked Dr. Pietruszka to review additional records concerning King, including the trial testimony of Drs. Tovar and Berkowitz. In Dr. Pietruszka's view, forensic evidence showed that King had an earlier traumatic brain injury. Specifically, the January 3, 2013 CT scan of King's brain found "mild atrophy," and the neuropathologist confirmed this finding. Because atrophy takes months or longer to occur, Dr. Pietruszka reasoned that King's fall down stairs may have caused it. However, the doctor also noted that "slapping or tapping of King['s] . . . head, with only minor or moderate force as described by . . . Clark, could certainly contribute to a worsening of the prior injury and may reasonably have contributed to the

35

catastrophic event that led to King['s] . . . death." Likewise, tossing King in the air and/or hitting his head on the carpet could have "aggravated some brain structure weakness and triggered the catastrophic event."

Dr. Pietruszka's opinion was King suffered an earlier trauma to his brain, "possibly from the falls down the stairs, or possibly from the repeated popping" of his head by" Clark, or a combination of both. The catastrophic event that caused King's death may have been the result of the application of a less than normally expected lethal application of force, such as tossing him into the air and catching him, which aggravated an earlier injury. "[T]he fall down the stairs likely caused the most serious underl[y]ing injury" and "the repeated blows to the head by . . . Clark may have been a contributing factor." "The presence of cerebral atrophy increases the risk of brain hemorrhage with even minor trauma."

Clark's trial counsel elected not to call a medical expert because based on the medical reports and Clark's statements to law enforcement, counsel instead chose to cross-examine the prosecution's medical witness.

### B.     *Counsel made a reasonable tactical decision*

"To establish ineffective assistance of counsel, a defendant must show that (1) counsel's representation fell below an objective standard of reasonableness under prevailing [professional] norms[;] and (2) counsel's deficient performance was prejudicial." (*People v. Scott* (1997) 15 Cal.4th 1188, 1211; *Strickland v. Washington* (1984) 466 U.S. 668, 687.) Prejudice is shown when there is a reasonable probability that but for counsel's error the result of the proceeding would have been different. " 'A reasonable probability is [one] . . . sufficient to

undermine confidence in the outcome.' " (*Scott*, at pp. 1211–1212.)

We must defer to trial counsel's reasonable tactical decisions and indulge the " ' "strong presumption that counsel's conduct falls within the wide range of . . . professional assistance." ' " (*People v. Weaver* (2001) 26 Cal.4th 876, 925.) Courts should not "second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight." (*People v. Scott*, *supra*, 15 Cal.4th at p. 1212.) "Tactical errors are generally not deemed reversible, and counsel's decisionmaking must be evaluated in the context of the available facts." (*People v. Bolin* (1998) 18 Cal.4th 297, 333.) There are countless ways to assist a defendant effectively, and we must be mindful that even the best criminal defense attorneys would not defend the same client the same way. (*Strickland v. Washington*, *supra*, 466 U.S. at p. 689.)

Here, Clark concedes his trial counsel made a tactical decision not to call Dr. Pietruszka as an expert. He just contends it was an unreasonable one. The record, however, shows it was more than reasonable. The doctor certainly could have opined— as did Drs. Tovar and Berkowitz—that a fall down stairs can cause brain injury and that the brain might be susceptible to reinjury. What Dr. Pietruszka could not have done was rule out that *Clark*—rather than the fall down stairs—caused any prior brain injury by repeatedly hitting King at a level of seven and sometimes a nine or 10. In fact, Dr. Pietruszka opined that King suffered an earlier trauma to his brain, "possibly from the falls down the stairs, *or possibly from the repeated popping* of his head by . . . Clark, or a combination of both." (Italics added.)

Thus, trial counsel had to weigh the value of having his own expert concede in front of the jury that Clark could have

37

caused any mild brain atrophy by hitting King on multiple occasions, thereby highlighting one of the more devastating facts to the defense case.  It is understandable that counsel might have decided he did not like those optics.  Instead, defense counsel made the reasonable, tactical decision to elicit the reinjury theory via the prosecution's experts.  To that end, counsel cross-examined Drs. Tovar and Berkowitz on the theory King had been injured in the fall down stairs, rendering his brain susceptible to reinjury or to a rebleed.  Even Clark's appellate counsel concedes that trial counsel did an "admirable" job on that score.  The defense theory was therefore fully and effectively presented to the jury.

## DISPOSITION

The judgment is affirmed.  The petition for writ of habeas corpus is denied.

NOT TO BE PUBLISHED.


DHANIDINA, J.


I concur:


EGERTON, J.


38

LAVIN, Acting P. J., Dissenting:

The California Supreme Court vacated our prior opinion and directed us to reconsider the cause in light of *People v. Perez* (2020) 9 Cal.5th 1. *Perez* held that failure to object to pre-*Sanchez*[1] expert testimony that related case-specific hearsay does not forfeit the issue on appeal. On reconsideration, the majority restates its prior opinion without any substantive change.

As I stated before, the prosecution's expert witnesses, Doctors Jason Tovar and Carol Berkowitz, based their opinions on case-specific hearsay. Because their testimony was improperly admitted under *Sanchez*, and that testimony was central to defendant's conviction for assault on a child causing death in violation of Penal Code section 273ab, I would reverse count 1 and remand for retrial of that count. Therefore, and once again, I respectfully dissent.

## 1. The experts related case-specific hearsay to the jury.

Essentially, "[t]his case presents the following issue: May an expert relate as true the case-specific content of documents which were neither admitted into evidence nor shown to be covered by a hearsay exception?" (*People v. Yates* (2018) 25 Cal.App.5th 474, 476.) Here, the prosecution's experts, Tovar, the medical examiner, and Berkowitz, an expert in child abuse pediatrics, testified about the case-specific content of documents that were not admitted into evidence, including reports prepared

---

[1] *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*).

by an ophthalmologist and neuropathologist.[2] In my view, this was error. (See *Sanchez, supra,* 63 Cal.4th at p. 677 [citing hemorrhaging in the eyes of a murder victim noted during autopsy as a case-specific fact that would need to be established by the autopsy surgeon]; *People v. Burroughs* (2016) 6 Cal.App.5th 378, 404 [trial court improperly admitted expert testimony relating to documents, such as police reports, probation reports, and hospital, that which formed the basis of their opinions].)

For example, in reaching his conclusion that King J. died from blunt-force trauma (as opposed to a natural cause or some underlying condition), Tovar testified that based on a drug screen of the child's urine and blood, there was no evidence of any drugs in his system. And based on the "U.C. Ophthalmology Report," there were "findings of retinal hemorrhages" and no indication of any natural disease process; the retinal hemorrhaging was therefore the result of "blunt force injuries." Tovar also testified that he submitted the child's brain and dura for microscopic analysis by the neuropathologist. Importantly, based on the neuropathologist's finding that the dura indicated no prior injury, Tovar opined there was no evidence the child had any prior injury that would have caused or contributed to the subdural hemorrhaging.

For her part, Berkowitz testified at length about certain "concerning" symptoms reflected in medical or paramedic reports (e.g., the child's fixed and dilated pupils were "a sign that there's been significant brain injury," E.K.G. results showing the

---

[2] *Sanchez* defined "case specific" facts as those "relating to the particular events and participants alleged to have been involved in the case being tried." (*Sanchez, supra,* 63 Cal.4th at p. 676.)

"electricity rate of 32," and low body and rectal temperatures). Notably, she also testified that based on observations by hospital staff, there "was evidence of bleeding within the back of the eye, what we call the fundi." And based on a CT scan from Kaiser Medical Center—which was done after the normal CT scan at Antelope Valley Hospital— she noticed there was a "lateral subdural hemorrhage." Towards the end of her direct examination, and after reviewing those reports, Berkowitz opined King suffered from "non-accidental abuse of head trauma" around the time he "became symptomatic."

In sum, the prosecution neither presented nor did the trial court admit into evidence the records or other documents that were the sources of the case-specific hearsay the experts related to the jury.

## 2. The error was prejudicial.

We review the erroneous admission of expert testimony under the state standard of prejudice. (*People v. Watson* (1956) 46 Cal.2d 818, 836; *People v. Stamps* (2016) 3 Cal.App.5th 988, 997.) Under that standard, it is reasonably probable defendant would have obtained a more favorable outcome had the error not occurred.

First, the error went to the heart of the defense that King's previous head trauma made him more susceptible to serious injury from relatively minor applications of force. (See *People v. Neidinger* (2006) 40 Cal.4th 67, 79.) For example, in his opening statement, counsel emphasized that there was no sign King had been beaten and none of the bruising one would expect to see on an abused child. Counsel's cross examination of Tovar focused exclusively on whether minor force could have killed King— namely, the prosecution's failure to reveal information about

3

King's prior injuries to Tovar; the possible medical consequences of King's earlier falls; how any trauma from those falls could have dovetailed with later, minor applications of force; and whether the lack of external, visible injuries provided evidence of that minor force. Counsel focused on these same issues in closing argument. And the jury agreed with that defense—at least in part. Jurors acquitted defendant of murder but convicted him of the lesser-included offense of involuntary manslaughter based on simple battery.

Second, the jury plainly struggled with count 1. For example:

- The jury deliberated for three days. (See *People v. Cardenas* (1982) 31 Cal.3d 897, 907 [six hours of deliberations is evidence of a close case].)

- The jury asked several questions—including one seeking clarification of the reasonable-person element of count 1. (See *People v. Hernandez* (1988) 47 Cal.3d 315, 352–353 ["request[s] to the court for further instructions or the rereading of particular testimony" indicate jury disagreement].)

- The jury requested readback of testimony given by Tovar, the medical examiner—particularly his testimony "regarding when he was aware of Baby King falling down stairs on two occasions and if it would affect his opinion on cause of death." (See *People v. Pearch* (1991) 229 Cal.App.3d 1282, 1295 ["Juror questions and requests to have

4

testimony reread are indications the deliberations were close. [Citations.]"].)

- The jury requested readback of testimony given by the paramedic.

- The jury requested readback of defendant's testimony.

- The jury asked for a DVD player and monitor to view interview testimony.

- The jury notified the court that it could not reach a verdict for count 1. (See *People v. Soojian* (2010) 190 Cal.App.4th 491, 520–521 [hung jury is a more favorable result than a guilty verdict for *Watson* purposes].)

- The jury reported on Juror No. 5's financial hardship and asked if that juror could be replaced with an alternate, indicating a desire to continue deliberating.[3]

To summarize, the prosecution's experts improperly related as true case-specific facts contained in hearsay statements, and that testimony was prejudicial. Because I would reverse the conviction for count 1 under *Sanchez*, I do not address defendant's other claims of error.

LAVIN, Acting P. J.

---

[3] The jurors reached a verdict shortly after the court responded that Juror No. 5 could not be replaced with an alternate.

5